PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CARRIZO (UTICA) LLC | ) | CASE NO. 4:13CV00393 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| v. | ) | |
| | ) | |
| CITY OF GIRARD, OHIO, *et al.*, | ) | **MEMORANDUM OF OPINION AND** |
| | ) | **ORDER** [Resolving ECF Nos. 64, 67, 71, |
| Defendants. | ) | and 72] |

Pending before the Court are Motions for Summary Judgment filed by Plaintiff Carrizo (UTICA) LLC (ECF No. 64) and Defendant D&L Energy (ECF No. 67) against Defendant City of Girard.  Also pending before the Court is a Motion for Summary Judgment filed by the City of Girard against Carrizo and D&L Energy. ECF No. 72.  The Court has been advised, having reviewed the record, including the parties' briefs, attached exhibits, and the applicable law.  For the foregoing reasons, the Court grants in part and denies in part Carrizo's and D&L Energy's Motions for Summary Judgment.  ECF Nos. 64 and 67.  The Court denies the City of Girard's Motion for Summary Judgment (ECF No. 72) in its entirety.  The Court grants the City of Girard's First Motion for Leave to Exceed Page Limitations (ECF No. 71) for its summary judgment brief.

## I.  Factual Background

Plaintiff Carrizo (Utica) LLC ("Carrizo") alleges that Defendant City of Girard ("Girard") disavowed a binding oil and gas lease (the "Lease") that Girard originally entered into with Defendant D&L Energy Inc. ("D&L") in 2006.  ECF No. 1.  D&L drafted the Lease.  ECF No. 72-

(4:13CV00393)

5 at 6.  The Lease gave D&L permission to conduct oil and gas exploration on four tracts of land

in Trumbull County, Ohio.  ECF No. 1-1 at 3.  Entered into on March 16, 2006, the Lease states,

in relevant part:

> That the Lessor . . . does hereby lease and let exclusively unto the Lessee, for the
> purpose of drilling, operation for, producing and removing oil and gas and all
> constituents thereof, and of injecting air, gas, brine, and other substances from any
> source and into any subsurface strata . . . into and upon the leased premises at all
> times for the aforesaid purposes, being all that certain tract(s) of land(s) situated in
> the City of Girard, Liberty Township, Vienna Township, Weatherfield Township,
> Trumbull County, State of Ohio, as identified in Exhibit "C" (legal description)
> hereto attached and made a part hereof and containing 1003.68 acres, more or less.

ECF 1-1 at 3, ¶ 1.  Exhibit C of the Lease contains a legal description of the Premises in four

separate paragraphs that describe the geographic location of the tracts of land covered by the

Lease.  ECF No. 1-1 at 7.  The Lease further states:

> This lease, however, shall become null and void and all rights of either party shall
> cease and terminate unless, within Twelve (12) months from the date hereof, **a well
> shall be commenced on the premises,** or unless the Lessee shall thereafter pay a
> delay rental of $500.00 (Five-Hundred and 00/100 Dollars), payments to be paid
> yearly until the commencement of a well.  A well shall be deemed commenced
> when preparations for drilling have been commenced.

ECF No. 1-1 at 3, ¶ 3 (emphasis added).  Paragraph 19 of the Lease further states, in relevant part:

> It is mutually agreed that this instrument contains and expresses all of the
> agreements and understandings of the parties in regard to the subject matter
> thereof, and no implied covenant, agreement or obligation shall be read into this
> agreement or imposed upon the parties or either of them.

ECF No. 1-1 at 4, ¶ 19.  To argue that D&L was required to build four wells, Girard relies

on the following language in a City Ordinance (attached as an exhibit to Carrizo's Complaint and

D&L's crossclaims against Girard), signed, in relevant part, by Girard's Mayor and Law Director

on December 12, 2005.  The Ordinance authorized Girard to enter into the Lease with D&L:

(4:13CV00393)

> Said oil and gas lease shall include **one well on each of the properties** of Liberty Memorial Park, Tod Park, and Girard City Water Treatment Plant and one specific, directionally drilled well, at Girard upper Lake, labeled Well #1 as per Exhibit D and described more specifically in Exhibit C of the lease.

ECF No. 1-1 at 2 (emphasis added).  The face of the Ordinance indicates that it was read three times–on  August 22, 2005, September 12, 2005, and December 12, 2005–before the Girard City Council.  ECF No. 1-1 at 2.  D&L's former Vice President of Land Operations, Nicholas Paparodis[1], responded in interrogatories that he attended "three (3) council meetings to get the lease approved as follows: first reading on 8/22/05, second reading on 9/12/05 and third reading on 12/12/05."  ECF No. 72-8 at 14.  The Ordinance incorporated the Lease (ECF No. 1-1 at 2), but the Lease, which contains three exhibits, did not incorporate the Ordinance.  ECF No. 1-2. D&L has admitted that it has built only one well (known as the City of Girard Liberty Park No. 1 Well) on only one of the parcels covered by the Lease.  ECF No. 1 at 5 ¶ 15.  D&L completed the well on May 28, 2008.  ECF No. 72-5 at 8.  Girard continues to receive revenues from that well. ECF No. 1 at 5 ¶ 15.  In his affidavit, Nicholas Paparodis averred "it was not my intention nor was it the intention of D&L that D&L would be required to drill a well on each of the four tracts of property covered by the Lease . . . it was my intention and the intention of D&L that by drilling and operating a well on any of the property covered by the Lease, D&L would hold all land under the Lease by production beyond the initial one-year term."  ECF No. 73-1 ¶ 4.  D&L argues that the Lease remains valid due to production under paragraph 2 of the Lease, which states:

> This lease shall continue in force and the rights granted hereunder by (*sic*) quietly enjoyed by the Lessee for a term of Five (5) Years and so much longer thereafter

---

[1]  Nicholas Paparodis is now the CEO and President of D&L.  ECF No. 73-1 ¶ 1.

(4:13CV00393)

> as oil and gas or their constituents are produced or are capable of being produced
> on the premises in paying quantities, in the judgment of the Lessee, or as the
> premises shall be operated by the Lessee in the search for oil and gas . . . .

ECF No. 1-1 at 3 ¶ 2.  Girard argues that the Lease's 5-year term has expired and that D&L has breached the Lease term because it has only built one well.

In 2011, D&L and Huntington Energy Group, LLC ("Huntington") entered into a Letter of Intent ("LOI"), in which D&L agreed to sell and assign its interests in the Lease to Huntington. ECF No. 1-6.  Carrizo was an intended third-party beneficiary of the LOI, and the document expressly referenced Carrizo as a potential purchaser of D&L's rights in the Lease.  ECF No. 1 at 6-7 ¶ 19.  On October 25, 2011, Carrizo entered into an agreement with Huntington for the purchase and assignment of D&L's interests in the Lease.  ECF No. 1 at 7 ¶ 21.  Specifically, Huntington granted Carrizo an option to purchase D&L's interests.  On November 22, 2011, D&L assigned 100% of its working interest and 83.875% of its net revenue interest in three of the four parcels of property covered by the Lease to Carrizo.  ECF No. 1 at 8 ¶ 24.  Carrizo paid $1,749,044 to D&L, $477,012 to Huntington, and assigned certain royalty interest to Huntington. ECF No. 1 at 8-9 ¶ 25.

In November 2011, at Carrizo's request, D&L proposed an Amendment and Ratification to Girard that would have explicitly granted the lessee the rights "to all formations and horizons lying below the base of the Clinton Sandstone."  ECF No. 72-10; ECF No. 72-7.  Girard did not agree to the Amendment and Ratification.  ECF No. 72-5 at 5.  In December 2011, James Melfi, Mayor of Girard, sent a letter to D&L which stated "D&L has not elected to commence drilling a well on any of the four locations within the five-year lease term as originally indicated."  ECF No. 67-2.  Mayor Melfi argued that the market price paid for drilling leases had increased and

(4:13CV00393)

further stated, "[i]f your Company is willing to negotiate a new lease considering current prices,

the City would be willing to consider a proposal; otherwise we are treating the March 16, 2006,

lease as having expired." ECF No. 67-2.  D&L responded in a letter:

> I respect your decision to decline to Amend or ratify the Oil and Gas Lease;
> however you are mistaken in your assessment regarding the validity of the lease
> by and between The City of Girard and D&L Energy, Inc.
>
> D&L Energy, Inc. has drilled a well on property covered by the lease (Liberty
> Park), thereby holding the lease by production.  As you well know, the City of
> Girard is receiving revenues from said well known as the City of Girard Liberty
> Park No. 1 Well.

ECF No. 67-3.  In January 2012, Girard's counsel sent a letter to D&L which stated that the

Lease was null and void because D&L had failed to drill a well on each of the properties and

because Girard had failed to comply with certain statutory notice requirements.[2]  ECF No. 67-4.

Carrizo and D&L also allege that the counsel's letter stated that the oil and gas rights conferred

by the Lease did not cover oil and gas rights below the Clinton Sands formation.  ECF No. 1 at 4-

5 ¶ 29, ECF No. 67-9 at 5.[3]

Concerned about the status of the Lease, Carrizo filed the instant lawsuit asserting

numerous causes of action against Girard, D&L, and Huntington.  ECF No. 1.  Against Girard,

Carrizo seeks a declaration of the Lease's validity and enforceability, and seeks to enjoin Girard

from taking any action to impair the mineral rights that Carrizo acquired from D&L.  Against

---

[2]  Girard brought this allegation as a counterclaim against Carrizo and as a crossclaim
against D&L Energy, which this Court dismissed in its October 31, 2014 order.  ECF
No. 77 at 4-7.

[3]  Upon review, the letter makes no direct mention of the Clinton Sands formation.  ECF
No. 67-4.

(4:13CV00393)

D&L and Huntington, Carrizo seeks, in the event that the Lease is held invalid, relief on the grounds of rescission, unjust enrichment, breach of contract, negligent misrepresentation, conversion and conspiracy. ECF No. 1 at 10-12.

## II. **Procedural Background**

Girard, Huntington, and D&L filed answers and asserted affirmative defenses to Carrizo's Complaint. ECF Nos. 12, 39, and 50. Girard filed eight counterclaims against Carrizo and eight crossclaims against D&L and Huntington.[4] ECF No. 50. D&L filed three crossclaims against Girard. ECF No. 42. Upon motion by the parties, the undersigned ordered the issues bifurcated in the following manner:

Phase 1

- Carrizo's First and Second Claims for Relief asserted against Girard.
- Girard's First through Eighth Counterclaim and Crossclaims with respect to its requests for declaratory judgment, to quiet title, and liability determinations on its claims asserting a breach of the Lease (but not damages)
- Any Counterclaim or Crossclaim to be filed by D&L upon its return to participating in this case after the automatic stay is lifted regarding the validity, continued enforceability or scope of the Lease.[5]

Phase 2

- Carrizo's Third through Eighth Claims for Relief against D&L and Huntington.
- Girard's First through Eighth Counterclaim and Crossclaims with respect to

---

[4] Huntington filed a bankruptcy petition in the United States Bankruptcy Court, Northern District of Ohio, on January 20, 2014. *See* U.S. Bankr. Ct., W.D. Pa., Case No. 14-20203. Defendant Huntington subsequently filed a notice of bankruptcy with this Court on January 21, 2014. ECF No. 46. The Court had already dismissed Count 1 of Girard's counterclaims and crossclaims with respect to Huntington. ECF No. 36.

[5] On May 13, 2013, D&L filed a Notice of Bankruptcy which led to an automatic stay against proceeding with respect to D&L. ECF No. 17. The Bankruptcy Court partially lifted the stay to allow D&L to participate in the litigation according to the bifurcated schedule. ECF No. 40.

(4:13CV00393)

> damages if liability is found to exist during Phase 1.
> • Any Counterclaim or Crossclaim to be filed by D&L upon its return to participating in this case after the automatic stay is lifted that does not involve the validity, continued enforceability or scope of the Lease.

ECF No. 36 at 9-10.  D&L moved to dismiss seven of Girard's eight crossclaims, pursuant to Fed. R. Civ. P. 12(b)(6).  ECF No. 52.  Carrizo moved for judgment on the pleadings on each of Girard's eight counterclaims.  ECF No. 53.  The Court dismissed Girard's Counterclaims and Crossclaims One and Four, which respectively alleged that the Lease was void because of Girard's failure to abide by statutory requirements and because of a lack of a mutually agreed-upon lease agreement.  ECF No. 77.  The Court denied the remainder of Carrizo's and D&L's motions.

Carrizo filed a Motion for Summary Judgment on its first two claims and on Girard's remaining counterclaims.  ECF No. 64.  Girard filed an opposition.  ECF 70.  D&L filed a Motion for Summary Judgment on Girard's remaining crossclaims.  ECF No. 67.  Girard filed an opposition.  ECF No. 73.  D&L filed a reply.  ECF No. 74.  Girard filed a Motion for Summary Judgment.  ECF No. 72.  Carrizo filed an opposition (ECF No. 76) and D&L did as well (ECF No. 75).  The remaining claims for the Court's consideration, therefore, are:

1. Girard's second counterclaim and crossclaim, alleging that the terms of the Lease have expired and that D&L breached the implied covenant to develop;

2. Girard's third counterclaim and crossclaim, alleging that the Lease did not include formations below Clinton Sands;

3. Girard's fifth counterclaim and crossclaim, alleging that Carrizo and D&L

(4:13CV00393)

> breached the Lease by failing to pay delay rentals on undrilled wells;

4. Girard's sixth counterclaim and crossclaim, alleging that Carrizo and D&L breached the Lease by failing to pay spud payments and gas allotment fees on undrilled wells;

5. Girard's seventh counterclaim and crossclaim, alleging that Carrizo and D&L breached the Lease by failing to make gas allotment payments on the drilled well;

6. Girard's eighth counterclaim and crossclaim (*i.e.*, prayer for relief), seeking declaratory judgment, quiet title, and damages;

7. Carrizo's first claim, seeking declaratory relief regarding the Lease's validity and enforceability against Girard, entitling Carrizo to exercise all rights assigned to it by Defendant D&L; and

8. Carrizo's second claim, seeking preliminary and permanent injunctive relief to prevent Girard from re-leasing the mineral rights that Carrizo has already acquired, or otherwise interfering with or impairing Carrizo's rights under the Lease.

The Court will consider each claim, counterclaim, and crossclaim below.

### III. <u>Legal Standard</u>

**A. Summary Judgment**

Summary judgment is appropriately granted when the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." <u>Fed. R. Civ. P. 56(a)</u>;

(4:13CV00393)

*see also* Johnson v. Karnes, 398 F.3d 868, 873 (6th Cir. 2005). The moving party is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party must "show that the non-moving party has failed to establish an essential element of his case upon which he would bear the ultimate burden of proof at trial." Guarino v. Brookfield Twp. Trustees, 980 F.2d 399, 403 (6th Cir. 1992).

After the movant makes a properly-supported motion, the burden shifts to the non-moving party to demonstrate the existence of a genuine dispute. An opposing party may not simply rely on its pleadings; rather, it must "produce evidence that results in a conflict of material fact to be resolved by a jury." Cox v. Ky. Dep't of Transp., 53 F.3d 146, 150 (6th Cir. 1995). To defeat the motion, the non-moving party must "show that there is doubt as to the material facts and that the record, taken as a whole, does not lead to a judgment for the movant." Guarino, 980 F.2d at 403. In reviewing a motion for summary judgment, the court must view the evidence in a light most favorable to the non-moving party when deciding whether a genuine issue of material fact exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970).

The United States Supreme Court, in deciding Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), stated that in order for a motion for summary judgment to be granted, there must be no genuine issue of material fact. Id. at 248. A fact is "material" only if its resolution will affect the outcome of the lawsuit. In determining whether a factual issue is "genuine," the court must decide whether the evidence is such that reasonable jurors could find that the non-moving party

(4:13CV00393)

is entitled to a verdict.  *Id.*  Summary judgment "will not lie . . . if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."  *Id.*  To withstand summary

judgment, the non-movant must show sufficient evidence to create a genuine issue of material

fact.  *Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990)).  The existence of a mere

scintilla of evidence in support of the non-moving party's position ordinarily is not sufficient to

defeat a motion for summary judgment.  *Id.*

      The legal standard applied to cross-motions for summary judgment does not differ from

the standard applied when one party to the litigation files a summary judgment motion.  *Ferro*

*Corp. v. Cookson Group, PLC*, 585 F.3d 956, 949 (6th Cir. 2009).  Each cross-motion must be

evaluated on its own merits, with the court viewing all facts and reasonable inferences in the light

most favorable to the nonmoving party.  *See Appoloni v. U.S.*, 450 F.3d 186, 189 (6th Cir. 2006).

## B.  Ohio Contract Law

      In Ohio, the interpretation of written contracts, including lease agreements, is a question

of law.  *Heritage Court, LLC v. Merritt*, 187 Ohio App.3d 117, 122, 931 N.E.2d 194 (2010).

Leases are subject to the traditional rules of contract interpretation.  *Mark-It Place Foods, Inc. v.*

*New Plan Excel Realty Trust*, 156 Ohio App.3d 65, 84, 804 N.E.2d 979 (2004).  In construing the

terms of any contract, "the principal objective is to determine the intention of the parties."

*Hamilton Ins. Serv. Inc. v. Nationwide Ins. Cos.*, 86 Ohio St.3d 270, 273, 714 N.E.2d 898 (1999).

"The rights and remedies of the parties to an oil or gas lease must be determined by the terms of

the written instrument[.]"  *Harris v. Ohio Oil Co.*, 57 Ohio St. 118, 129, 48 N.E. 502 (1897).

"Such leases are contracts, and the terms of the contract with the law applicable to such terms

must govern the rights and remedies of the parties."  *Id*.

(4:13CV00393)

"The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement." *Kelly v. Medical Life Ins. Co.*, 31 Ohio St.3d 130, 130, 509 N.E.2d 411 (1987). "Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Authority*, 78 Ohio St.3d 353, 361, 678 N.E.2d 519 (1997). Furthermore, "[t]he meaning of a contract is to be gathered from a consideration of all its parts, and no provision is to be wholly disregarded as inconsistent with other provisions unless no other reasonable construction is possible." *Karabin v. State Auto. Mut. Ins. Co.*, 10 Ohio St.3d 163, 167, 462 N.E.2d 403 (1984) (quotations omitted).

"Where the terms in a contract are not ambiguous, courts are constrained to apply the plain language of the contract." *St. Marys v. Auglaize Cty. Bd. of Commrs.*, 115 Ohio St.3d 387, 390, 875 N.E.2d 561 (2007). "Contractual language is ambiguous only when its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." *Covington v. Lucia*, 151 Ohio App.3d 409, 414, 784 N.E.2d 186 (2003) (quotations omitted), *appeal denied*, 99 Ohio St.3d 1435, 789 N.E.2d 1117 (2003). "If an ambiguity exists in a contract, then it is proper for a court to consider 'extrinsic evidence,' i.e., evidence outside the four corners of the contract, in determining the parties' intent." *Id.* "A factfinder must then resolve the ambiguity." *Zebrasky v. Valdes*, 175 Ohio App. 3d 670, 674, 888 N.E.2d 1130, 1133 (2008) (holding that the trial court erred by not having a trial to resolve a contractual ambiguity: "a court may consider extrinsic evidence to ascertain the parties' intent when a contract is ambiguous . . . a factfinder must then resolve the ambiguity" because the

(4:13CV00393)

contract was subject to more than one reasonable interpretation) (citing *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 797 N.E.2d 1256 (2003)); *see also Henry v. Chesapeake Appalachia, L.L.C.*, 739 F.3d 909, 910 (6th Cir. 2014) (same).[6]  "Ohio courts have generally resolved contract ambiguities against the drafter only where parties lacked equal bargaining power to select contract language." *Michael A. Gerard, Inc. v. Haffke*, 2013-Ohio-168, at ¶ 14 (App. Ct. 2013).

The above rules "contain a measure of flexibility in their application" but they are designed only to ascertain the parties' intent.  *Foster*, 78 Ohio St.3d at 362.  Courts are admonished that it is not their function "to rewrite the parties' contract in order to provide for a more equitable result.  "A contract 'does not become ambiguous by reason of the fact that in its operation it will work a hardship upon one of the parties thereto.'" *Id.* (quoting *Ohio Crane Co. v. Hicks*, 110 Ohio St. 168, 172, 143 N.E. 388 (1924)).

## IV.  **Discussion**

### A.  **Whether the Lease Terms Have Expired and Whether D&L and Carrizo Breached the Implied Covenant to Develop (Second Counterclaim and Crossclaim)**

In its second counterclaim and crossclaim, Girard argues that the 5-year Lease term has expired.  Girard also argues that the Lease is void because Defendants failed to comply with an implied covenant to develop the properties.  As excerpted above, the Lease states that it will

---

[6]  In a minority of cases, Ohio courts have stated that after reviewing extrinsic evidence for an ambiguous contract, a judge may enter summary judgment when the extrinsic evidence is undisputed and reveals the contract to have but one reasonable meaning*. See Graham v. Dryodock Coal Co.,* 76 Ohio St.3d 311, 313, 667 N.E.2d 949 (1996); *see also Cincinnati Ins. Co. v. ACE INA Holdings, Inc.*, 175 Ohio App.3d 266, 886 N.E.2d 876, 888 (2007).

(4:13CV00393)

continue after the five-year period as long as oil or gas is being produced or capable of being produced "in paying quantities, in the judgment of the Lessee." ECF No. 1-1 at 3 ¶ 2. Carrizo and D&L assert that the Lease is valid by production from the sole well drilled. They also argue that the Lease expressly denounced any and all implied covenants. Carrizo and D&L have moved for summary judgment on this counterclaim and crossclaim.

Girard does not dispute that D&L drilled one well or that it receives royalties on the production from that well. The Court determines that the plain language of paragraph 2 of the Lease allows the lessee, D&L and its successor, Carrizo, to decide whether oil or gas is being produced or capable of being produced. It appears, therefore, that the Lease is not invalid based solely on the expiration of time.

Paragraph 19 of the Lease explicitly states "[i]t is mutually agreed that this instrument contains and expresses all of the agreements and understandings of the parties in regard to the subject matter thereof, and no implied covenant, agreement or obligation shall be read into this agreement or imposed upon the parties or either of them." ECF No. 1-1 at 4, ¶ 19. Because the plain language of the Lease clearly disclaims any and all implied covenants, Girard's claim of a breach of an implied covenant to develop must fail. *See Bilbaran Farm Inc. v. Bakewell, Inc.*, 993 N.E.2d 795, 799 (Ct. App. 2013) ("'While gas and oil leases contain an implied covenant requiring the lessee to reasonably develop the leased property, Ohio courts have consistently enforced express provisions in such leases that disclaim the implied covenant'") (quoting *Bushman v. MFC Drilling*, No. 2403-M, 1995-WL-434409, at *1 (Ohio Ct. App. July 19, 1995)). The Court, therefore, grants summary judgment to D&L and Carrizo on Girard's second counterclaim and crossclaim.

(4:13CV00393)

**B.** **Whether the Lease Covered the Formations Below Clinton Sands (Third Counterclaim and Crossclaim)**

For Counterclaim and Crossclaim Three, Girard alleges that the Lease does not give the lessee the right to drill below the Clinton Sands formation because "at the time the purported lease was signed the parties could not have anticipated the existence of Marcellus Shale or Utica Sands formation or that there were any mining methods to reach such formations that could be developed beneath the Clinton Sands formation." ECF No. 50 at 14-15 ¶ 15. Although Girard does not address this specific issue in its Motion for Summary Judgment,[7] D&L and Carrizo do. They argue that the Lease did not place any limitations as to what formations could be drilled. ECF No. 64-1 at 12; ECF No. 67-9 at 26. An examination of paragraph 1 of the Lease, *supra* at 2, corroborates D&L's and Carrizo's position. That Girard did not know about the existence of such deep formations is irrelevant to the Court's inquiry. "As in most jurisdictions, Ohio law does not require contracting parties to share a subjective meeting of the minds to establish a valid contract . . . what it does require is that the terms of the agreement establish an objective meeting of the minds . . . ." *216 Jamaica Ave., LLC v. S & R Play House Realty Co.*, 540 F.3d 433, 440 (6th Cir. 2008) (citations omitted). Paragraph 1 of the Lease explicitly states that the lessees have exclusive rights for "producing and removing oil and gas . . . from *any* source and *into* any

_____

[7] For the flawed proposition that the Lease is void, Girard mentions the Amendment and Ratification to the Lease that D&L proposed in November 2011 that would have explicitly assured Clinton Sands drilling rights to D&L and its successors, but Girard does not make a summary judgment argument regarding the Formation below the Clinton Sands. ECF No. 72 at 19-20. As the nonmoving party on this claim, therefore, Girard "has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). Furthermore, D&L's proffer of an Amendment and Ratification at Carrizo's request could have just been an attempt to memorialize that which it believed already existed.

(4:13CV00393)

subsurface strata . . . ."  ECF No. 1-1 at 3 ¶ 1.  The Lease does not specify the geological

formations for development.  Because the Lease contains no depth formation limitation, and

because Girard has not presented any facts to the contrary, the Court grants summary judgment to

D&L and Carrizo on Girard's third counterclaim and crossclaim.

> **C.     Whether D&L and Carrizo Breached the Lease by failing to Pay Delay
>           Rentals on Undrilled Wells  (Fifth Counterclaim and Crossclaim)**
>
> **1.      Whether the Lease Terms Required One or Four Wells**

In Counterclaim and Crossclaim Five, Girard alleges that D&L breached paragraph 3 of

the Lease by failing to pay yearly delay rentals of five hundred dollars for each of the three

undrilled wells.  Girard argues that the Lease unambiguously states that D&L was required to

build a well on each of the four tracts of land described in Exhibit C of the Lease and as clearly

stated in the Ordinance.  D&L and Carrizo argue that the terms of the Lease are unambiguous

and that "a well shall be commenced on the premises" implies one well in total, rather than one

well on each tract of land.  ECF No. 1-1 at 3 ¶ 3.  When contract language uses words capable of

two conflicting, yet reasonable interpretations, the contract is ambiguous.  *See United Tel. Co. of*

*Ohio v. Williams Excavating, Inc.*, 125 Ohio App.3d 135, 153, 707 N.E.2d 1188, 1200 (1997).

The parties have debated the meaning of the "premises."  Even though appearing to be

plural, "premises" can be used to describe a single location or place.  The legal description made

in Exhibit C of the Lease, however, perverts this usage.  ECF No. 1-1 at 7 (listing four locations).

While the Court is familiar with the common usage of the term "premises," reviewing its

definition may be helpful in understanding the term.  Courts often resort to dictionaries as the

best source for establishing the ordinary meaning of a contractual term.  *See Rite Aid of Ohio v.*

*Marc's Variety Store*, 93 Ohio.App.3d 407, 638 N.E.2d 1056 (1994); *Andrews v. Tax*

(4:13CV00393)

*Commission of Ohio*, 135 Ohio St. 374, 21 N.E.2d 106 (1939).  In Webster's Third International

Dictionary (2002) 1789, the term "premises", when used to define a location or place, is:

> b : a specified piece or tract of land with the structures on it[;] c : a building,
> buildings, or part of a building covered by or within the stated terms of a policy
> (as of fire insurance)[;], d : the place of business of an enterprise or institution.

In Black's Law Dictionary (10th Ed. 2014), the term "premises", when used to define a location

or place, is:

> 3. A house or building, along with its grounds; esp., the buildings and land that a
> shop, restaurant, company, etc. uses <smoking is not allowed on these premises>.

These dictionary definitions do not assist the Court with its inquiry.[8]  If the only document before

the Court were the Lease itself,[9] the Court might have been inclined to agree with D&L and

Carrizo.  There are four separate tracts of land, however, described in Exhibit C incorporated into

the Lease, each of which could be its own "premises."  Inartful drafting has led to ambiguity,

leaving the Court with the task of engaging in negotiations that were the responsibilities of the

parties.  The four corners of the Lease and its exhibits do not offer an answer.  Nor is there

---

[8]  Nor is the Court persuaded by D&L's argument that a definition in the Random House
Dictionary clarifies the meaning of "premises".  ECF No. 73 at 12.  That entry provides
the following definition: "the property forming the subject of a conveyance or bequest."
Not only is this definition tied to the history of the word's legal usage in deeds (*see*
PREMISES, Black's Law Dictionary (10th ed. 2014)), but it does not solve the
ambiguity that persists upon examination of Exhibit C of the Lease.  ECF No. 1-1 at 7.
D&L further argues that the Lease did not cover a single tract of land or contiguous
tracts of land.  That opinion still does not resolve the ambiguity.  The Lease clearly
allows for multiple tracts when it grants the lessee "the right to enter into and upon the
leased premises at all times . . . being all that certain **tract(s) of land(s)** situated in the
City of Girard . . . ."  ECF No. 1-1 at 7.  Because the Lease itself uses the term "tract of
land", it is disingenuous for D&L to try to distance itself from a definition of "premises"
that incorporates the term "tract of land."

[9]  As mentioned above, the Lease states, in relevant part, "a well shall be commenced on
the premises . . . ."  ECF No. 1-1 at 3 ¶ 3.

(4:13CV00393)

convincing evidence of an industry practice of defining "premises" in such situations.

Where a Court determines that ambiguity exists, "the interpretation of such language . . . is a factual issue turning on the intent of the parties." *Lincoln Elec. Co. v. St Paul Fire and Marine Ins. Co.*, 210 F.3d 672, 683 (6th Cir. 2000) (applying Ohio law) (internal quotations omitted); *see also Brown v. Columbus All-Breed Training Club*, 152 Ohio App.3d 567, 571, 789 N.E.2d 648, 652 (2003). ("where the language of a contract is reasonably susceptible of more than one interpretation, the meaning of ambiguous language is a question of fact") (citing *Ohio Historical Soc. v. General Maintenance & Engineering Co.*, 65 Ohio App.3d 139, 146, 583 N.E.2d 340, 344 (1989)).  The Ordinance adds to the pile of confusion and confirms the existence of ambiguity.  *See id.* at 684, fn. 12 ("Extrinsic evidence can become a consideration *before* an ambiguity has been identified from the face of the contract as a matter of law, in the limited sense that such evidence can assist the court in determining whether, as a matter of law, two plausible interpretations exist in the manner necessary to give rise to the *existence* of an ambiguity").

It is clear that the Lease does not incorporate the Ordinance.  D&L has admitted, however, that one of its officers attended the three council meetings in which the Ordinance was read.  The Ordinance, not the Lease, clearly states that "[s]aid oil and gas lease shall include one well on each of the properties . . ." ECF No. 1-1 at 2.  One reading of the Lease can support the reasonable interpretation that the parties contemplated four wells, as stated in the Ordinance. Another reading supports the reasonable interpretation that the parties contemplated one well, as

(4:13CV00393)

averred in an affidavit offered by D&L.[10]  Because of the ambiguity, it now falls to the fact-finder

to determine the intent of the parties.  *See* *Zebrasky*, 175 Ohio App. 3d at 674-75 (holding that

"the trial court erred by not having a trial to resolve th[e] ambiguity" because the contract was

subject to more than one reasonable interpretation); *see also* *Henry v. Chesapeake Appalachia,*

*L.L.C.*, 739 F.3d 909, 910 (6th Cir. 2014) ("'it is generally the role of the finder of fact to resolve

ambiguity'") (quoting *Westfield Ins. Co.*, 797 N.E.2d. at 1262).  Because there is a genuine issue

of material fact as to how many wells the Lease contemplated, summary judgment is denied to all

parties on Girard's fifth counterclaim and crossclaim.

Carrizo further argues that because the Lease contains an integration clause, Girard's fifth

counterclaim should be barred.  Along with disclaiming any implied covenants, paragraph 19 of

the Lease states that "this instrument contains and expresses all of the agreements and

understanding of the parties."  The parole evidence rule, Carrizo argues, precludes Girard from

introducing the Ordinance.  The Supreme Court of Ohio has stated that "[t]he rule as applied to

contracts is simply that as a matter of substantive law, a certain act, the act of embodying the

complete terms of an agreement in a writing (the 'integration'), becomes the contract of the

parties." *Galmish v. Cicchini*, 90 Ohio St. 3d 22, 27, 734 N.E.2d 782, 789 (2002) (internal

---

[10]  In *City of Toledo v. Firstar Bank, N.A.*, 2004-Ohio-5238 ¶ 9, 2004 WL 2341392 (Ct. App. September 24, 2004), appellant, a bank, attempted to rely on an ordinance to support its interpretation of a contract with the appellee.  In affirming summary judgment for appellee, the court was able to determine the intent of the parties from the contract itself, but noted that even if it were to examine the extrinsic evidence of the ordinance, the ordinance would not change the meaning of the contract.  In the matter before the Court, however, the Lease is ambiguous on its face, allowing the Court to consider the extrinsic evidence of the Ordinance.

(4:13CV00393)

citations omitted) (barring the introduction of parole evidence where the contract contained an

integration clause and the court deemed the terms of the contract unambiguous).  When a court,

however, determines that ambiguity exists within the four corners of the contract, as in the instant

matter, the integration clause carries less weight.  *See* *Center Ridge Ganley, Inc. v. Stinn*, 31

Ohio St. 3d 310, 312, 511 N.E.2d 106 (1987) ("parol [evidence can be admitted] to explain

certain ambiguous terms not inconsistent with or contradictory to the language of the contract . . .

.") (citations omitted); *see also* *Doody Company v. Montgomery Ward and Co., Inc.*, 1984 WL

5717, at *4 (Ohio Ct. App. Apr. 26, 1984). That the Lease is ambiguous about one of its

operative terms and thus subject to two competing yet reasonable interpretations[11] permits the

Court to examine outside evidence, in the form of extrinsic evidence, or prior or

contemporaneous statements, in the form of parole evidence.

### 2.    Applicability of the Statute of Limitations

Alternatively, D&L and Carrizo argue that R.C. § 2305.041 bars Girard's fifth crossclaim

and counterclaim.  The statute states:

> With respect to a lease or license by which a right is granted to operate or to sink
> or drill wells on land in this state for natural gas or petroleum and that is recorded
> in accordance with section 5301.09 of the Revised Code, an action alleging breach
> of any express or implied provision of the lease or license concerning the
> *calculation or payment of royalties* shall be brought within the time period that is
> specified in section 1302.98 of the Revised Code.  *An action alleging a breach
> with respect to any other issue that the lease or license involves* shall be brought

---

[11]  The Court acknowledges that if it determined that only one reasonable interpretation
existed after reviewing the extrinsic evidence, the court could have entered summary
judgment for the prevailing party as a matter of law.  *Shell Oil Co. v. Huttenbauer Land
Co., Inc.*, No., 1993 WL 129835, at *2 (Ohio Ct. App. Mar. 31, 1993); *Cinvest, Inc. v.
Freed*, 1992 WL 281387, (Ohio Ct. App. Oct. 14, 1992).  Because the extrinsic evidence
of the Ordinance and Nicholas Paparodis' affidavit are in tension however, a genuine
issue of material fact remains as to the appropriate interpretation of the Lease.

(4:13CV00393)

within the time period specified in **section 2305.06** of the Revised Code.

R.C. § 2305.041 (emphasis added).  Section 1302.98 of the Revised Code specifies that "[a]n action for breach of any contract for sale must be commenced within four years after the cause of action has accrued."  If this were indeed the governing statute, Girard's claim would have accrued on March 16, 2007, a year after the Lease was signed with no well having been built.  Girard's claim would have expired on March 16, 2011.  But Girard's claim has not expired.  Girard does not claim that D&L failed to pay royalty fees, which are governed by a different paragraph of the Lease (paragraph 4).  Girard claims that D&L failed to pay delay rentals, which are governed by paragraph 3 of the Lease and are distinct from royalty payments.  Instead, R.C. § 2305.06 governs.  It states "[e]xcept as provided in sections 126.301 and 1302.98 of the Revised Code, an action upon a speciality or an agreement contract, or promise in writing shall be brought within eight years after the cause of action accrued."  *Id.*; *see also Interstate Petroleum Co. v. Young*, 2013-Ohio-1943, ¶ 33, 992 N.E.2d 468, 474 (Ct. App. 2013) (holding that R.C. § 2305.06's statute of limitations, formerly 15 years, applied to a written oil and gas contract between a lessor and lessee regarding the enforceability of a lease and the lessee's alleged failure to develop the premises).  Girard, therefore, has eight years after the action began to accrue–March 16, 2007–to bring this counterclaim and crossclaim.  Because Girard filed its counterclaims and crossclaims on May 14, 2013, a little over 6 years after its claim accrued, the statute of limitations does not bar this issue.

Because a genuine issue of material fact exist regarding the number of drilled wells contemplated by the Lease, the Court denies summary judgment to all parties on Girard's fifth counterclaim and crossclaim.

(4:13CV00393)

**D.** **Whether D&L and Carrizo Breached the Lease by Failing to Pay Spud Payment Rentals or Gas Allotment Fees on Undrilled Wells (Sixth Counterclaim and Crossclaim)**

In Counterclaim and Crossclaim Six, Girard alleges that D&L breached the Lease by failing to pay spud payments and gas allotment fees on the three undrilled wells.  D&L and Carrizo deny that the Lease required them to build three additional wells.  For the same reasons outlined above in Section IV.C.1, the Court denies summary judgment to all parties on this counterclaim and crossclaim.  Carrizo also moved for summary judgment on this counterclaim based on R.C. § 2305.041.  Because that statutory provision only governs royalties and not spud payments or gas allotment fees (as articulated in Section IV.C.2), it is not applicable to this counterclaim.

**E.** **Whether D&L Failed to Make Gas Allotment Payments on Drilled Well (Seventh Counterclaim and Crossclaim)**

Girard claims that D&L "breached its agreement under ¶ 23 of the Lease by failing to pay the cash equivalent of 400,000 cubic feet of gas at $3.00/mcf ($1,200.00 per year) per well for a term of five years as required under the agreement for the one well that it drilled." ECF No. 50 at 17-8 ¶ 28.  D&L argues that this crossclaim is moot because D&L has made the gas allotment payments on the drilled well.  D&L asserts that when it discovered that it had missed the fifth and final gas allotment payment due under the Lease, "D&L endorsed and delivered a check for $1,200.00 payable to the order of the City of Girard to satisfy its obligation." ECF No. 67-9 at 11-12.  D&L states that Girard promptly cashed the check (ECF No. 67-9 at 12) and has provided a copy of the canceled check.  ECF No. 67-6.  In its opposition to D&L's motion for summary judgment, Girard does not argue that D&L failed to pay the gas allotment payments on the drilled

(4:13CV00393)

well.  Accordingly, the Court grants summary judgment to D&L, and to Carrizo by extension, on

Girard's seventh counterclaim and crossclaim.

## V.  Conclusion

For the above reasons,  the Court denies Girard's Motion for Summary Judgment (ECF

No. 72) in its entirety.  Also, the Court grants in part and denies in part Carrizo's and D&L's

Motions for Summary Judgment (ECF Nos. 64 and 67).  Specifically, the Court:

1.   Grants summary judgment to D&L and Carrizo on Girard's second, third,
     and seventh counterclaims and crossclaims;

2.   Denies summary judgment to D&L and Carrizo on Girard's fifth and
     sixth counterclaims and crossclaims;

3.   Denies summary judgment to Carrizo on its first claim for declaratory
     judgment.  The enforceability and validity of the Lease remain questions
     of fact until there is a determination regarding how many wells were
     contemplated by the Lease;

4.   Denies summary judgment to Carrizo on its second claim for preliminary
     and permanent injunctive relief because the enforceability and validity of
     the Lease are still to be determined;

5.   And denies summary judgment to D&L and Carrizo on Girard's eighth
     counterclaim and crossclaim (*i.e.*, prayer for relief) for declaratory judgment,
     quiet title, and damages because Girard can still prevail on its fifth and sixth
     counterclaims and crossclaims.

Also, the Court grants Girard's Motion to Exceed Page Limitations for its Summary Judgment

(4:13CV00393)

Brief.  ECF No. 71.  Accordingly, the case will proceed to trial on Carrizo's first and second

claim and Girard's fifth, sixth, and the remaining portions of the eighth counterclaims and

crossclaims.


      IT IS SO ORDERED.


March 30, 2015                                 /s/ Benita Y. Pearson
Date                                         Benita Y. Pearson
                                              United States District Judge